UNITED STATES, Appellee

v.

THOMAS H. FAIR and HAROLD BOYCE, Privates E–2,
U. S. Army, Appellants

2 USCMA 521, 10 CMR 19.

522

523

Nos. 908 and 1188

Decided May 20, 1953

Max H. Karl, Esq., LT COL George E. Mickel, U. S. Army, and 1ST LT Bernard Landman, Jr., U. S. Army, for Appellants.

LT COL Thayer Chapman, U. S. Army, and CAPT Irvin M. Kent, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused in these cases were tried jointly by general court-martial in Austria on charges of premeditated murder in violation of Article 118 of the Uniform Code of Military Justice, 50 USC § 712. Both accused were found guilty and sentenced to death. Army reviewing authorities have upheld the findings and sentence, and the case is here for mandatory review pursuant to Article 67(b)(1) of the Uniform Code of Military Justice, 50 USC § 654.

Disposition of this case requires that the facts be set out in some detail. On the night of August 13, 1951, the accused Fair, a member of the 440th Transportation Truck Company, had an

argument with Sergeant Richard C. Byrd in the "EM Bali Club," in Wels, Austria. The following evening the accused Boyce, the accused Fair and Private Harold Joseph were all present at the Bali Club. While discussing the incident of the previous evening, Fair told Joseph that "he [Fair] was going to get Sergeant Byrd." At about 11 p.m. Joseph left the club and stood near the end of the driveway which leads to the club. He was later joined by the two accused. Shortly thereafter, Sergeant Byrd, Elisabeth Holzner, and Private First Class McGee left the club and passed Joseph and the two accused. They were followed by Corporal Gist and Private Rutledge. While Gist con-

tinued down the street in the same direction Byrd and his group had gone, Rutledge and Joseph exchanged words, but almost immediately thereafter Rutledge followed Gist. According to Joseph, "after Private Rutledge left me, I was going back to the entrance of the club just in the driveway about two steps in the driveway, and I heard a clicking noise and I saw Boyce and Fair with pistols. Boyce raised the pistol and fired in the direction of Rutledge and McGee and the rest of them." At the time of the shooting Fair "had his pistol out, but he wasn't doing anything." Gist, hearing two shots in the direction from which he had just come, turned and saw Rutledge lying on the ground. He then heard a second series of shots coming from the direction of Sergeant Byrd and his companions. McGee was asked to and did dispose of a pistol for Sergeant Byrd. As Rutledge lay on the ground, blood was observed flowing from a wound on his nose. Sergeant Byrd called someone from the club and Rutledge was placed in a car and taken to the hospital. Private Joseph testified that later in the evening he saw Boyce in the latter's room at the company. Joseph informed him that Rutledge "got killed," to which accused Boyce replied, "Ja."

In the course of the investigation following the shooting, Private McGee took Agent Joseph Colombo to the scene of the incident and pointed to where he had thrown the weapon given him by Byrd. The agent searched this area and found the gun, a 7.65 caliber automatic pistol. A clip containing two rounds of ammunition was inserted in the weapon at the time it was found.

Captain Howard L. Carbaugh, 124th Station Hospital, Camp McCauley, Austria, was medical officer of the day on the night of August 14, 1951. At approximately 11:20 p.m. a male negro patient was admitted and was pronounced dead on arrival. The identity of this person as Private William Rutledge was established by a stipulation entered into by the prosecution, the defense, and each of the accused. The following morning Captain Carbaugh performed an autopsy which revealed a "gun shot wound of the head and a penetration of the brain and component parts." In his opinion death was caused by a "gun shot wound of the head," and must have occurred at approximately 11 p.m.

Later the same day Captain Carbaugh gave the bullet which he had taken from the deceased's head to Major Thomas W. Wilson, then Provost Marshal of the Linz Military Post, in the presence of Agent William J. Burden, 12th MP, CID. The Major marked the bullet with a nail clipper and turned it over to Agent Burden. The bullet was subsequently examined by Master Sergeant George A. Gordon, 27th Military Police Crime Laboratory, and Mr. Josef Frasl, Vienna Police Department, ballistic experts. Each testified that he had examined the projectile in question and found it to be a 9-mm. bullet. It was the opinion of both experts that the bullet could not have been fired from the 7.65 caliber pistol found through Private McGee.

Each of the accused, having been advised of his rights to testify on his own behalf, elected to remain silent. The court then recalled several of the prosecution witnesses each of whom reiterated the substance of his previous testimony.

Agent Burden testified additionally that, subsequent to extensive interrogation concerning the pistol, the accused Boyce had in his possession the night of the shooting, Boyce "told me that he would take me to Wels to where he had hidden the pistol he was in possession of on the evening of the 14th." On the afternoon of August 21, 1951, he accompanied the accused Boyce to No. 4 Karl Loy Strasse in Wels, located approximately two blocks from the Bali Club. At that address the accused dismounted from the vehicle in which they were riding and "procured the pistol off of a rafter of a canopy which overhangs the sidewalk." The rafter, approximately seven feet above the sidewalk and about eight inches wide, would normally not be visible to a passer-by. The agent identified Court Exhibit 1, a caliber 9-mm. pistol, as the weapon handed him by the accused. When he first obtained the pistol, he looked in-

side the barrel and noticed what appeared to be "burnt powder residue."

Master Sergeant Gordon, also recalled by the court, testified that he had examined Court Exhibit 1 and had compared the projectile (Pros Ex 2) with bullets known to have been fired from the exhibit weapon. On the basis of these comparison tests he stated: "I cannot say Exhibit 2 was fired from Exhibit 4 [Court Exhibit 1]. I can just say it might have been fired from there."

Testifying in extenuation and mitigation, Sergeant Joseph L. Herbert, a member of the accused's unit, stated that he had known the accused Fair for two years and the accused Boyce for approximately eighteen months. He had always found the two to be cooperative in the performance of their duties and he considered them to be average soldiers. Sergeant First Class Lemorn Bailey, also a member of the 440th Transportation Truck Company, testified that he had known the accused Boyce for two years and the accused Fair for ten months. He had never had any difficulties with either Boyce or Fair and as a result of an observation of their performance of duties he felt that both were good soldiers.

It is first claimed by defense that prejudicial error was committed by the law officer in permitting trial counsel to read extracts from legal authorities at the beginning of the trial. Trial counsel requested permission to read the extracts in question, and permission was granted. Defense interposed no objection at this point. Trial counsel proceeded to read extracts from the Manual for Courts-Martial, United States, 1951, and several Army board of review opinions concerning the legal elements of murder, theories allowing conviction of aiders and abettors as principals, and the effect to be given circumstantial evidence. During the process, defense objected several times on the ground that some of the extracts were not from "authoritative sources." The objections were overruled. At the conclusion of the reading, defense was offered an opportunity to demonstrate inaccuracies in the matter read or to

**526**

present other legal authorities. Counsel did not, however, avail himself of the opportunity.

Paragraph 44g(2) of the Manual, supra, provides that "After the pleas, the trial counsel will, to ▆▆▆▆ ▆ the extent required by the law officer . . . , read the parts of this manual or of authoritative precedents that are pertinent to the definition and proof of any offense charged and to the defense thereto." Defense urges that this provision should be interpreted to permit presentation of legal authorities to the law officer only, and then only upon request by that official. The Government gives the subparagraph in question a much broader interpretation, arguing that it permits counsel to read legal authorities at will, subject only to the control of the law officer.

In the civilian sphere, the reading of legal authorities to the jury by counsel is generally frowned upon. Some jurisdictions appear to have adopted a strict rule prohibiting such a practice entirely. See, e.g., Heller v. Pulitzer Pub. Co., 153 Mo 205, 54 SW 457. Other jurisdictions, while frowning upon the practice, hold to the rule that it is a matter within the discretion of the trial judge. People v. Terper, 186 App Div 830, 175 NY Supp 197; Kuhn v. United States, 24 F2d 910 (CA 9th Cir). In all jurisdictions, it is agreed that rules of law should, as a usual practice, be given to the jury by the judge, not by counsel, in order to avoid confusion and misapprehension as to the legal framework to which the facts of the case must be applied.

Applying this sound rule to the language of paragraph 44g(2), we think the better interpretation would be that legal authorities should be presented to the court by counsel only when the law officer deems it necessary or advisable, and that, as a general rule, the practice should be avoided. Whenever possible, the law should be given to the court by the law officer. This does not, of course, prevent counsel from arguing for a particular legal theory in their presentations of the case to the court. It does mean that the law officer should

not allow the court to be confused by quotations from legal authorities, to which undue weight might be attached by those unlearned in the law. If the law officer feels that legal authority should be presented to the court at the outset of the case, then he may ask trial counsel to do so. If counsel requests permission to read such authority, then the law officer should carefully examine the authority before it is read to the court to insure that it constitutes an "authoritative precedent" in the language of the paragraph in question, and then should only permit the reading if he deems it desirable or essential to a proper understanding of the case by the court.

Applying these concepts to the case at hand, we think it fair to say that the law officer erred in giving to trial counsel the wide latitude he did to read from a variety of sources, several of which could hardly be labelled "authoritative precedents." Included in the extracts read were quotations from board of review opinions decided under the 1928 Manual and Articles of War then in effect; from various state appellate court opinions, from American Jurisprudence, and from Philos' Handbook of Court-Martial Law. Some of these constitute, to say the least, doubtful precedents.

However, it remains to determine whether this procedure resulted in substantial prejudice to the accused. We think it did not. While defense counsel did object to the authoritative nature of certain of the quotations read, he nowhere objected either to the legal content of the quotations or to the procedure itself. Counsel was afforded an opportunity to assail the accuracy of the statements of law by presenting authorities of his own. He did not do so. We find in the quotations read no major inaccuracies. At the close of the case, the law officer instructed the court carefully and fully on the legal elements of the crime of premeditated murder. There is no indication in the record that the court was either misled or confused by the legal extracts read by trial counsel. Taking all these circumstances into account, it is our opinion that the procedure followed did not result in substantial prejudice to the accused.

The next issue concerns an invocation of the attorney-client privilege by one of the principal prosecution witnesses that, according to defense counsel, resulted in a prejudicial limitation upon cross-examination. Private Joseph, who contributed materially to the prosecution's case, was originally suspected and was under investigation as being involved in the offense of which the accused were found guilty. Thereafter, he was granted full immunity from prosecution by the convening authority, and testified against the accused at the trial. During cross-examination, defense counsel—who had also acted as Joseph's counsel during the pretrial investigation—asked Joseph if he had not at that time told him that he, Joseph, had fired the fatal shot. This, in an effort to impeach Joseph's credibility. The law officer precluded counsel from pursuing this point by permitting Joseph to rely upon the attorney-client privilege. Defense now contends that the immunity from prosecution granted to Joseph constituted, in effect, a legal waiver of the privilege, and that Joseph should have been required to answer the question propounded by counsel.

The protection afforded by the attorney-client privilege is recognized by the Manual for Courts-Martial, United States, 1951, paragraph 151b(2). It is admitted by counsel that neither of the circumstances permitting waiver by that paragraph, contemplated commission of crime and voluntary disclosure of the subject matter of the protected conversation, are applicable here. Defense relies upon decisions of several American jurisdictions which have held that when an accomplice is granted immunity and testifies against his alleged co-conspirators, he may be cross-examined concerning earlier disclosures to his attorney which would be otherwise protected by the attorney-client privilege. See, e.g., Alderman v. People, 4 Mich 414; Jones v. States, 65 Miss 179, 3 So 379; State v. Ingels, 4 Wash 2d 676, 104 P2d 944. There is, however, considerable authority to the contrary. See Sutton v. State, 16 Tex Crim App

**527**

490; State v. Barrows, 52 Conn 323; Bigler v. Reyher, 43 Ind 112; State v. James, 34 SC 49, 12 SE 657; Underhill, Criminal Evidence, 5th ed, § 333. The board of review below, assuming the validity of the rule relied on by defense, held that the rule did not apply since the record established that Joseph was not an accomplice.

We agree, with the board of review below, that there is even more reason in the military than in the civil sphere to encourage complete disclosure to his attorney by an individual in the armed forces accused of crime. There is a natural reluctance on the part of an enlisted man to supply details of possible wrongdoing to a superior officer. Without full knowledge of all the facts, an officer selected or appointed as counsel cannot adequately prepare a proper defense. It is, therefore, our view that the rule, grounded as it is in policy reasons even more sound in the military than in the civilian community, should be strictly enforced and not relaxed.

An examination of the cases relied on by defense discloses that the courts adopting the rule of waiver rely heavily upon an analogy drawn to the rule imposing waiver of self incrimination protections where immunity has been conferred. The analogy is, we think, not well-taken. The privilege against self incrimination is designed solely as a protection for the witness. If the witness obtains immunity, the protection is no longer needed and the sole reason for the privilege is gone. The attorney-client privilege is, however, not designed solely to protect the client. Indeed, the privilege originally rested not with the client but with the attorney. The rule is designed to encourage full and unrestrained communication between client and attorney. Any forced revelation of conversations resulting from the relationship is certain to discourage free and full disclosure of facts by the person seeking assistance of counsel. It is no complete answer to say that the client is protected from prosecution based on the disclosures— he may fear for reasons other than prospective legal punishment disclosure of the statements made in confidence to the attorney. For example, one involved with criminals but not an accomplice may not desire to have his admission of association made public at a trial.

It is our opinion that any forced admission of statements made under a belief of security from subsequent disclosure is certain to damage the sound policy which dictates enforcement of the attorney-client privilege. We are not persuaded that immunity from prosecution removes the reason for enforcing the privilege. In our opinion, the injury that would inure to the attorney-client relation by the disclosure of the thought-to-be-privileged communication is greater than the benefit thereby gained for the correct disposal of litigation.

It is next contended by defense that the law officer erred in his rulings concerning the admission in evidence of a pistol, allegedly used by the accused Boyce. The court, on its own motion, proffered the pistol in evidence. Trial counsel objected on the ground that since the pistol was found by agents through information supplied by the accused Boyce, it was in the nature of an admission, and voluntariness had to be shown as a condition precedent to admission. Defense counsel joined in the objection. The law officer ruled that, defense had the burden of showing lack of voluntariness, and permitted both trial and defense counsel to adduce evidence on the issue.

The evidence indicates that Boyce was questioned repeatedly by Criminal Investigation Division agents. No promises were made, nor were any threats offered. Boyce, while confined in a segregation cell, was fed regularly and was not mistreated. He was fully advised of his rights under Article 31 of the Code, 50 USC § 602. Questioning continued intermittently from the night of August 14 to the morning of August 23, when Boyce made a statement. However, the accused was not deprived of food or sleep during this period, and there is no intimation in the record that the questioning was continuous. Boyce was permitted to bathe and shave

daily. On one occasion, the accused were kept awake and standing for an hour between 3:00 a.m. and 5:00 a.m. by throwing water in their faces. Finally, after repeated requests, the accused Boyce agreed to show the agents where he hid the gun.

The information given by Boyce as to the location of the gun was certainly a self-incriminatory statement and, as such, must be treated as an admission. It is the usual rule that, if there is no indication of involuntariness, an admission may be received without preliminary proof of voluntariness. Manual for Courts-Martial, United States, 1951, paragraph 140a. It is undoubtedly this rule which the law officer had in mind when he ruled that the burden of showing involuntariness rested on defense. While the law officer's ruling was ambiguous, it may be construed as saying no more than the Manual—that there must be an "indication of involuntariness" before there is any necessity of the Government's establishing that an admission is voluntary. However, even assuming that the law officer's statement of the law was erroneous, we are unable to find any prejudice resulting therefrom. All the circumstances surrounding the questioning of Boyce were divulged in the collateral inquiry concerning the admission. Defense was accorded full opportunity to establish involuntariness. The only factors indicating, in any way, that the admission was not freely given were the confinement in segregation, the repeated questioning and the incident where water was thrown in the accused's face. The segregated confinement does not appear to be coercive in view of the fact that the accused was allowed to bathe and shave, was fed regularly, and was not deprived of sleep except for the one occasion mentioned above. The questioning periods—some five or six of them—were very short and extended over a period of eight days. Compare Harris v. South Carolina, 338 US 68, 93 L ed 1815, 69 S Ct 1354; Turner v. Pennsylvania, 338 US 62, 93 L ed 1810, 69 S Ct 1352. The water throwing incident can hardly be said to have produced the admission, since it occurred

on August 15, some seven days before the admission was made. These circumstances, it seems to us, fall far short of establishing the "lack of free will" that is required before we can upset the determination of voluntariness made by the trier of fact below. United States v. Monge (No. 9), 2 CMR 1, decided January 8, 1952; United States v. Colbert (No. 401), 6 CMR 3, decided October 3, 1952. We may also note that, even if the admission as to the location of the lethal weapon be deemed involuntary, this would still not be a bar to admission of the gun itself in evidence. Manual for Courts-Martial, paragraph 140a, supra.

Next to be considered is the defense contention that the law officer erred in excluding a defense exhibit, which purported to be a letter of instruction to CID agents advising them as to the action to be taken in procuring statements from suspects. Defense endeavored to use the letter in its showing that the admission discussed above was involuntary. We find no error here. Inquiry was proper as to the methods actually used by the agents in procuring the statement involved, and defense had ample opportunity to cross-examine the agents on this subject. If the methods described in the letter of instructions were used, this could have been established through direct questioning of the agents. If they were not, then the description of methods advised would have been irrelevant and immaterial.

Defense urges as error the failure of the law officer to instruct the court on the lesser offense of unpremeditated murder. The test to be applied in determining whether such an instruction is necessary is that the lesser offense must constitute, under the evidence, a "reasonable alternative" to the offense charged. United States v. Ollie C. Williams (No. 251), 2 CMR 137, decided March 14, 1952; United States v. Roman (No. 191), 2 CMR 150, decided March 19, 1952; United States v. Banks (No. 382), 4 CMR 71, decided July 24, 1952. We concur with the reasoning of the board of review below that this record establishes a deliberate, preconceived

killing carried out under circumstances entirely devoid of provocation or justification. Defense offered no evidence that would tend to detract from the effect of the Government's case. We find no evidence in the record that required an instruction on unpremeditated murder and, therefore, hold that the law officer did not err in failing to instruct on the elements of the lesser offense.

We turn finally to consideration of the evidence. Accused Boyce makes no claim that there is insufficient evidence to establish his guilt. Fair, on the other hand, urges that, since the actual shooting was done by Boyce, there is insufficient evidence to convict him as a principal. The Manual for Courts-Martial, United States, 1951, paragraph 156, provides as follows:

"To constitute one an aider and abettor under this article, and hence liable as a principal, mere presence at the scene is not enough; there must be an intent to aid or encourage the persons who commit the crime. The aider and abettor must share the criminal intent or purpose of the perpetrator. If there is a concert of purpose to do a given criminal act, and such act is done by one of the parties, all probable results that could be expected from the act are chargeable to all parties concerned; but in order to make one liable as a principal in such a case, the offense committed must be one embraced by the common venture or an offense likely to result as a natural or probable consequence of the offense directly intended.

"An accused, without intent to kill and without active participation in a homicide, is a principal guilty of a murder committed by those with whom he voluntarily associated himself in the execution of an unlawful design so desperate that it ordinarily involves a hazard to life. Moreover, an accused who plans a burglary which is actually carried out by his associates is a principal in the burglary, and, if his associates shoot and kill the home owner in the course of the burglary, the planner is a principal in the murder as well."

The evidence establishes that Fair stated he was going to "get" Sergeant Byrd. Shortly thereafter, he was observed standing in the driveway outside the club entrance with the accused Boyce. According to the witness Joseph, Fair had his pistol out but did not fire it. It would be searching for an unreasonable hypothesis to say that, in view of these circumstances, Fair could have been merely an "innocent bystander." His remark concerning Byrd indicated a preconceived plan; his standing with Boyce with a pistol drawn is clear proof of an act in furtherance of the plan. We cannot say, under these circumstances, that there is not substantial evidence to support the finding of guilty as to Fair.

There are other minor errors alleged by defense which we have carefully considered and find to be not serious enough to warrant discussion. Finding no errors prejudicial to the substantial rights of the accused, the decision of the board of review is affirmed.

LATIMER, Judge (concurring):

I concur.

While I concur with the Chief Judge's opinion, I prefer to develop more fully the subject which divides the Court. There are two reasons why I believe that issue should be decided adversely to the accused. In the first place, I do not believe the law officer erred in listening to the trial counsel read from the various authorities. Second, assuming he did err, the error did not substantially prejudice the accused.

It is conceded that paragraph 44g of the Manual for Courts-Martial, United States, 1951, authorizes the procedure adopted by the trial counsel. Whether we like the system or not is of no particular importance in view of the fact that we are powerless to change the procedure authorized by the Manual unless we can find it in some manner violates the provisions of the Code or that it is so basically unsound as to deny the accused a fair trial. This particular privilege cannot be denied for either reason. It is not contrary

to the Code, and it can be of distinct advantage to an accused. In this connection we must bear in mind peculiarities of the military judicial system. The provisions of the Code, in certain instances, superimpose the court-martial over the law officer and permit it to overturn his rulings on certain matters of law. This may be done on an issue of insanity or when a motion to dismiss is interposed by an accused. In the latter instance the court-martial members may decide a question of law, namely, whether the evidence is sufficient or insufficient, as a matter of law, to sustain a finding of guilt. It would appear to me to be grafting an unnecessary limitation on the Code and the Manual to permit trial or defense counsel to argue matters of law to the law officer and to the court and yet deny them the privilege of quoting from legal authorities.

Civilian authorities would not hold it error for a judge to listen to arguments for or against a legal proposition, merely because the lawyers did not confine themselves to strict and correct interpretations of the law. Furthermore, I believe in those jurisdictions where a jury is permitted to make certain legal determinations, the same principle would apply. Certainly it would appear a difficult task for a court-martial to determine whether a motion to dismiss a case should or should not have been granted by the law officer unless it were permitted to hear arguments on the law.

There was no motion pending before the court at the time trial counsel presented the authorities. He is privileged to anticipate the possibilities of one being interposed and to present his arguments before trial starts. In addition, he may have been seeking to enlighten the court and the law officer on his theory of the case and the legal principles which he contended would support his view of the law. Assume he quoted the authorities which were irrelevant or were legally incorrect, it is not error for the law officer to listen. Furthermore, I do not believe it is error for the members of the court-martial to do likewise. It is extremely difficult to tell what law is relevant until

the facts have been unfolded and the court might be called upon to determine their sufficiency. In all events, I had always supposed that error arose, not from listening to improper or irrelevant authorities but in relying and acting upon them. As I understand the law and our decisions, the law officer is the one who stamps the law of the case with authenticity. He and he alone lays down the law to be followed. If, perchance, the authorities cited by counsel are contrary to the law as announced by the law officer, the latter governs.

A slightly stronger argument presents itself against the procedure if the case has been finished and counsel are arguing on a finding of guilt. When a case has reached that point, the court members are no longer interested in questions of law, other than those to be announced by the law officer, and principally to avoid cluttering the minds of members of the court with matters of no relevancy, it might be advisable to curtail citations. However, it must be remembered that the law officer instructs the court-martial after arguments of counsel and they must anticipate his definition of the crime, the instructions he will give and the law he will announce. Until that is done the best source from which this information might be obtained is from the Manual and decided cases. If at this time arguments are permitted to include reading of excerpts from cases, counsel for the opposing side, the law officer, or both, should be more alert to make certain that the authorities are not in conflict with the law as it is to be given.

Assuming for the purposes of my second reason for supporting the holding that the law officer erred in permitting trial counsel to read from the authorities, I find no prejudice. These authorities were read at the commencement of trial on October 8, 1951; they were fairly lengthy, detailed and covered such subjects as a complete discussion of murder taken from the Manual for Courts-Martial, United States, 1951; excusable homicide and premeditation, from the same authority; malice, from a board of review

**531**

decision; presumption of malice from Winthrop's Military Law and Precedents, Second Edition, 1920 Reprint; accidental shooting; a killing of one while intending to kill another; aiders and abettors; and, circumstantial evidence. It was not until some four days later that the law officer gave his instructions to the court. It is conceded these were adequate and correct. Such being the case, I adopt the concept that the court-martial followed the instructions given by the law officer and not the lengthy quotations read by trial counsel. Assume trial counsel read the law correctly, and the law officer misinformed the court, I dare to suggest we would not hesitate to reverse because of a belief in that concept. Conversely, when trial counsel misadvises the court and the law officer instructs, legally and properly, we should not hesitate to affirm on the same theory. In addition, I believe we should face the individual facts in this case. Assuming the members of this court-martial were mental giants, they could not have retained in their minds the laws read to them by the trial counsel over the four-day intervening period. Accordingly, when the law officer correctly advised them immediately preceding their deliberation on a verdict, it is difficult for me to believe they remembered the difficult and forgot the simple. Moreover, to do so would require me to believe that the court went back of the instructions given by the law officer to adopt those given by trial counsel. That is a hazardous and unnecessary assumption to make, absent any showing in the record.

BROSMAN, Judge (concurring in part and dissenting in part):

I agree with the author of the principal opinion that the law officer erred in these cases in permitting trial counsel to read to the court-martial extracts from legal sources to the extent done. Of course, there is no necessary error in the fact that a trial counsel does read from legal authorities—for the Manual, under the conditions set out in paragraph 44g(2), expressly sanctions such a procedure. However, there must be limits to the extent to which the

practice will be indulged—and this conclusion appears to me to be inherent in the Manual paragraph, both in its phrasing and in terms of common sense and sound judicial administration. Although the matter certainly rests to a considerable degree in the sound judicial discretion of the law officer, it must always be kept within the bounds of reasonableness, and—most important of all—particular care must be exercised that the authorities read be in all respects accurate statements of the law.

## II

It is said that there were no "major inaccuracies" in the quotations read by trial counsel, although it is conceded that some were, at the very least, "doubtful precedents." One of these was a volume of American Jurisprudence and another was Philos' Handbook of Court-Martial Law. Strictly speaking, neither of these is, I believe, a "precedent," and I certainly find no express warrant in the Manual for their use. I take issue also with the observation as to inaccuracies, and need offer but a single example in support of my view. Among the extensive readings of trial counsel, I find the following, quoted from United States v. Heffner, 64 BR 119, 133:

"*The law presumes malice* where a deadly weapon is used in a manner likely to and does in fact cause death, and *an intent to kill may be inferred* from an act of the accused which manifests a reckless disregard for human life. 'Malice in law does not necessarily mean hate, ill will or malevolence, but consists in any unlawful act, wilfully done, without just excuse or legal occasion, to the injury of another person' (Wharton's Criminal Law, 12th Ed, Sec 146). '*Malice is presumed from a deliberate unlawful act* against another person, of such character as to show an abandoned and malignant disposition, as where an injury is caused by violence' (Id, Sec 148). It is inferred from all the facts of the case, as a presumption of fact (Id Secs 159, 438, 439 in Wharton's). *Malice aforethought imports premeditation* . . . ." [Emphasis supplied].

There is no necessity to examine the strict legal soundness of this passage—for, even if adequate in the factual setting from which it was taken, it is of doubtful validity as presented in vacuo, and is, at the very least, seriously misleading. I think its loose use of presumptions and inferences capable of great harm when directed to a group of legally untrained minds charged with making a determination of guilt or innocence. Of particular significance are the italicized portions, to the effect that malice may be presumed, and that a certain and undefined sort of malice in turn imports premeditation. From this one could quite properly gain the impression that premeditation may be *presumed* from the act itself. Of course, that is just not so.

Although only one possessed of psychic powers may determine with accuracy whether the triers of fact here were or were not misled by the extensive legal material read by trial counsel, I am of the firm conviction that there was at the very least a fair risk of prejudice requiring reversal. It has been ordered that these men pay for their crime the highest price the law exacts—their lives. Because I sense a possibility—perhaps only a remote one—that the court may have been influenced incorrectly by trial counsel's prolonged reading, I cannot be a party to affirmance of their conviction and sentence.

### III

Unless I misunderstand my brothers their argument comes substantially to this: since the Manual permits the *law officer* to read *law* to the members of the court-martial, it follows that it is not error for the *trial counsel* to read them *bad* law—or, at least, that no harm is done if he does. They do not seem to like this result, but feel that they are required to reach it because of certain Manual language to which they refer. It is apparent from earlier portions of this memorandum that I cannot agree at all with this conclusion—certainly against the background of the instant case.

It is indeed true that under military law the members of the court-martial—laymen though they are—may override rulings of the law officer, the "judge" of a general court, in *two* interlocutory instances: first, on the issue of sanity, and, second, on a motion for findings of not guilty. I have no purpose to deny that the effect of this rule—rightly or the reverse—is to assign to the court, as distinguished from the law officer, the final determination of what are at least mixed questions of law and fact. It follows that legal arguments may properly be addressed to the court in these instances—for the excellent reason that in them *the members of the court*—and *not* the law officer—are the judges of the *law* as well as the fact. These legal arguments will of necessity approach the problem from both sides, and here, I suspect, it is not incorrect to say that no error—certainly no prejudice—results from a reading of "bad" law to the court. However, in the present case we are not in any sense dealing with this sort of problem. No issue of sanity was raised in the case at bar, nor were the legal authorities read here addressed to a motion for findings of not guilty. They dealt instead with the elements of the offense charged—an area in which the members of the court are charged with literally *no* law-finding function, but are solely judges of *fact*. Thus we have a situation which is completely different from the ones just mentioned and demonstrably distinguishable therefrom. To fail to take this distinction is wholly to misunderstand, or perhaps to ignore, the widely differing functions of the court-martial in the two situations under scrutiny.

It is noteworthy, too, that trial counsel, as such, is given no right by military law to read legal "precedents" to the court in the situation here involved —nor is any claimed for him by the majority. When he does—the majority concedes—he does so only "to the extent *required* by the law officer," that is, in the latter's right, not his own. Manual, supra, paragraph 44g(2). (Emphasis supplied). Therefore, it would seem clear that we must measure the consequences of the trial counsel's conduct here by the same yardstick we would use had the law officer himself spoken—for the former is but the lat-

ter's delegate. Had the law officer furnished the court with dubious or confusing law, we would not hesitate for a moment to brand his conduct as prejudicially erroneous. Then why not here?

Additionally—unless I misapprehend them—my brothers appear here to attach but little importance to what trial counsel says to the court, particularly in the sphere of law. Apparently we are to understand that the members of the court will pay virtually no attention to *him*. It is surprising to me that they should hold his conduct so lightly here, when to do so would operate in the interest of the accused, and yet should weigh it so heavily in other instances, when to do so results—to my mind—in his prejudice. I am referring here to those cases—to which I have been no party, be it said—in which counsel's comments have been said to relieve the law officer of his statutory duty to instruct. See the following decisions among many: United States v. Estes (No. 773), 7 CMR 47, decided February 6, 1953; United States v. Glover (No. 829), 7 CMR 40, decided February 6, 1953; United States v. Cobb (No. 1240), 8 CMR 139, decided March 24, 1953; United States v. Charles E. Smith (No. 486), 9 CMR 70, decided May 5, 1953. It seems to me that they must say that a court-martial either will or will not pay attention to counsel's statements of law; they cannot have it both ways.

IV

Perhaps I should observe that I agree fully with the majority's disposition of the attorney-client privilege problem. Although in this particular case its application may appear to work a harsh result, there is no doubt that the privilege rests upon a sound and eminently sensible foundation. Unless it is protected in *all* cases its significance will be sharply impaired. Hard cases should not be permitted to made bad law—and we cannot carve out an exception to the privilege for the purposes of the immediate case.