UNITED STATES

v.

**Antoinette VANDERBILT, Hull Maintenance Technician Second Class (E–5), U.S. Navy.**

**NMCM 200000487.**

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 29 Oct. 1999.

Decided 19 May 2003.

LT Marcus N. Fulton, JAGC, USNR, Appellate Defense Counsel.

LT Ross W. Weiland, JAGC, USNR, Appellate Government Counsel.

Before OLIVER, Chief Judge,
VILLEMEZ, and HARRIS, Appellate
Military Judges.

HARRIS, Judge:

A general court-martial, composed of officer and enlisted members, convicted Appellant, contrary to her pleas, of conspiracy to

wrongfully sell or dispose of 21 handguns, military property of the United States, of a value greater than $100.00, and wrongfully disposing of 21 handguns, military property of the United States, of a value greater than $100.00, in violation of Articles 81 and 108, Uniform Code of Military Justice, 10 U.S.C. §§ 881 and 908.[1] On 29 October 1999, Appellant was sentenced to confinement for 21 months, reduction to pay grade E–1, forfeiture of all pay and allowances, and a dishonorable discharge. On 30 March 2000, the convening authority approved the adjudged sentence and, except for the dishonorable discharge, ordered it executed.

After carefully considering the record of trial, Appellant's two assignments of error, the Government's response, and Appellant's reply, we conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of Appellant was committed. *See* Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

### Statement of Facts

Appellant worked as an armorer at Naval Base Norfolk, Virginia security. On the morning of 16 March 1999, Naval Base Norfolk security personnel discovered that 21 handguns belonging to base security were missing. Base security personnel called the Naval Criminal Investigative Service (NCIS) to assist in the investigation. Based on the lack of any evidence of a break-in at the armory, NCIS special agents concluded early in the investigation that someone who worked at security had stolen the handguns. Because armorers man the armory 24 hours per day, NCIS special agents initially considered all of the armorers suspects. NCIS special agents conducted searches of all the armorers' workspaces, personal residences, and personal vehicles. None of the missing handguns were discovered during the course of these searches.

Four months after the Naval Base Norfolk security handguns were reported missing, Lamont Perry, a civilian who was incarcerated in a civilian jail awaiting trial on unrelated state charges, offered information regarding the stolen handguns to the Government in exchange for $220.00 and release on bond. Lamont Perry told an NCIS special agent that his friend Leon Hayes, a civilian, had 21 handguns that he wanted to get rid of quickly. Lamont Perry also told the NCIS special agent that Leon Hayes had acquired the handguns from a "black female [ (later identified as Appellant) ] who worked at the armory at Norfolk Naval Station." Record at 290. Lamont Perry agreed to cooperate with the Government by setting up a controlled buy of the stolen handguns from Leon Hayes. Lamont Perry arranged for an undercover NCIS special agent to meet Leon Hayes for a controlled purchase of two of the stolen handguns. He was arrested at the site of the controlled purchase. After his arrest, special agents of the NCIS and the Federal Bureau of Investigation (FBI) interrogated him. During the course of the interrogation Leon Hayes told NCIS special agents that he had obtained 21 stolen handguns from Appellant.

After his arrest and interrogation, Leon Hayes was charged in Federal District Court in the Eastern District of Virginia with receiving stolen Government property in violation of Title 18 U.S.C. § 641. He faced a maximum jail term of 10 years for his offense along with other penalties. He ultimately entered into a written agreement with the Government. Appellate Exhibit III at 4–12 (Hayes Plea Agreement of 12 Aug 1999). In this agreement, Leon Hayes agreed, among other things, to cooperate with the Government, plead guilty to the charge, testify before any grand juries or at any trials, courts-martial, or other proceedings, and "provide all documents, records, writings, or materials of any kind in [his] possession or under [his] care, custody, or control relating directly or indirectly to all areas of inquiry and investigation." *Id.* at 7–8.

Trial defense counsel specifically moved for discovery of these materials, to include statements made by Leon Hayes to his attorney related to his proffers of testimony, and notes created by Leon Hayes' attorney in

---

1. The court-martial acquitted Appellant of larceny of 21 handguns, military property of the United States, of a value greater than $100.00, in violation of Article 121, UCMJ, 10 U.S.C. § 921.

connection with his case. Record at 17; Appellate Exhibit I. The military judge denied this motion. Record at 23.

At trial, Leon Hayes testified that Appellant agreed to provide him with handguns (weapons). He also testified that less than one week after the discussion, Appellant delivered the stolen handguns to him, and then had to hurry back to the armory, because the armorers were all being recalled following the discovery of the theft. Leon Hayes testified that he agreed to pay Appellant $2,000.00 for the 21 stolen handguns.

Trial defense counsel pointed out several inconsistencies in Leon Hayes' testimony. Under cross-examination, Leon Hayes admitted that he had not told the truth at his deposition regarding Appellant's help in setting up a bank account at Navy Federal Credit Union (NFCU) where he is not entitled to be a member. He further admitted not telling the truth to NCIS special agents and at his deposition regarding his participation in a telephone call with Appellant. He also had some difficulty identifying the bag in which Appellant had delivered the firearms. Trial defense counsel elicited that Leon Hayes expected to serve 18–24 months in exchange for his cooperation out of a possible 10–year maximum sentence.

To rehabilitate Leon Hayes' credibility, trial counsel elicited prior consistent statements made by him to NCIS Special Agent (SA) Phyllis Underwood during the course of his interrogation. Trial defense counsel objected to the admission of Leon Hayes' statements on the grounds that they were hearsay. The military judge overruled the objection on the grounds that the statement was a prior consistent statement under Military Rule of Evidence 801(d)(1)(B), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.). After the military judge overruled the objection, SA Underwood testified that Leon Hayes admitted during his interrogation that he received the 21 stolen handguns from Appellant.

Lamont Perry, over trial defense counsel's objection, also testified at trial regarding statements that Leon Hayes had made detailing Appellant's role in obtaining the 21 stolen handguns. Trial defense counsel simi-

larly impeached the testimony of Lamont Perry, in part. On cross-examination, trial defense counsel impeached Lamont Perry by showing that he had been convicted of felony assault, brandishing a firearm, and discharging a firearm in public. Lamont Perry also revealed to trial defense counsel that he had been paid $220.00 and released on bond in exchange for helping the Government in the case.

As was the case with Leon Hayes, the Government sought to rehabilitate the credibility of Lamont Perry by introducing prior consistent statements of that witness consistent with his in-court testimony. The Government elicited testimony from NCIS SA Daniel D'Ambrosio that Lamont Perry said that Leon Hayes received the stolen handguns from Appellant. At the time Lamont Perry made this prior statement, he was incarcerated and supposedly interested in cooperating with the Government in exchange for being released on bond. Lamont Perry apparently based this statement on another out-of-court statement allegedly made by Leon Hayes to him. Trial defense counsel objected to SA D'Ambrosio's testimony on the grounds that it was hearsay. The military judge admitted the testimony as a prior consistent statement.

**Prior Consistent Statement Violations**

In Appellant's first assignment of error, she asserts that the military judge erred by improperly permitting trial counsel to bolster the testimony of Government witnesses with prior consistent statements of the witnesses made after they had a motive to fabricate. Appellant avers that this Court should set aside the findings and the sentence of the court-martial. We disagree.

Military courts review a military judge's ruling admitting or excluding evidence for an abuse of discretion. *United States v. Allison,* 49 M.J. 54, 57 (1998). An abuse of discretion will only be found where the military judge has made a "clear error in judgment." *United States v. Houser,* 36 M.J. 392, 397 (C.M.A.1993); *see also United States v. Travers,* 25 M.J. 61, 62 (C.M.A.1987)(stating that "[t]o reverse for 'an abuse of discretion involves far more than

a difference in ... opinion'"). An "abuse of discretion exists where reasons or rulings of the military judge are clearly untenable and ... deprive a party of a substantial right such as to amount to a denial of justice." *Travers,* 25 M.J. at 62. (internal quotations omitted). Such an abuse of discretion is more than a reasonable difference in opinion; instead this Court must find that the ruling was "arbitrary, fanciful, clearly unreasonable, or clearly erroneous in order to be invalidated on appeal." *Id.*

 The Military Rules of Evidence provide in pertinent part that "[a] statement is not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." MIL. R. EVID. 801(d)(1)(B). Our superior Court "has consistently interpreted [MIL. R. EVID. 801(d)(1)(B)] to require that a prior statement, admitted as substantive evidence, precede any motive to fabricate or improper influence that it is offered to rebut." *Allison,* 49 M.J. at 57.

At issue in Appellant's case are the statements of two witnesses, Leon Hayes and Lamont Perry, made to NCIS special agents. Appellant's Brief of 27 Mar 2002 at 6.

**A. Statement of Leon Hayes**

 Leon Hayes was a civilian Government witness who had previously pled guilty in Federal court to unlawfully receiving 21 handguns (9mm pistols). On direct examination during the Government's case-in-chief, he testified that he had known Appellant and her family for 1 to 2 years.[2] He further testified that he had spoken with Appellant between 20 and 30 times since he had known her. He explained in detail how Appellant offered to obtain handguns (firearms) for him, called him to arrange for delivery, and subsequently provided the handguns to him.

He also testified about how he paid Appellant for the handguns.

On cross-examination, trial defense counsel attacked Leon Hayes' credibility by suggesting that he named Appellant as the source of the handguns, not because it was true, but in order to preserve a plea agreement he had in his own case. Record at 173–74; *see* Appellate Exhibit III at 4–12 (Hayes Plea Agreement of 12 Aug 1999). In response, the Government called NCIS SA Underwood. She testified that she interviewed Leon Hayes on 31 July 1999 about the stolen handguns. She stated she made no promises of leniency or immunity to him. She testified further that he told her the handguns came from Appellant. Appellant *did not object* to this testimony.[3]

Generally, failure to object to the admission of evidence forfeits the issue on appeal in the absence of plain error. MIL. R. EVID. 103(a). The purpose of requiring a trial objection is to allow the parties and the military judge to address issues of admissibility of the evidence. *United States v. Cardreon,* 52 M.J. 213, 216 (1999). To abandon the concept of forfeiture this Court would "encourage the practice of 'sandbagging': suggesting or permitting, for strategic reasons, that the trial court pursue a certain course, and later—if the outcome is unfavorable—claiming that the course followed was reversible error." *Freytag v. Commissioner,* 501 U.S. 868, 894, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991)(Scalia, J., concurring in part and concurring in the judgment); *see also United States v. Reist,* 50 M.J. 108, 110 (1999)(stating that "[t]he waiver rules are designed to prevent defense counsel from remaining silent, making no objection, and then raising the issue on appeal for the first time, long after any possibility of curing the problem has vanished. It is important to encourage all trial participants to seek a fair and accurate trial the first time around.")(internal quotations omitted).

---

2. Leon Hayes was the boyfriend of Appellant's sister, Amanda, and the father of Amanda's child. Record at 156.

3. While Appellant made a hearsay objection to SA Underwood testifying about how many handguns Leon Hayes told her he was involved with, no objection was made regarding whom he said the weapons came from. Record at 391.

The Rules for Courts–Martial provide a framework for how a trial is to be conducted. "The military judge should not exclude evidence which is not objected to by a party except in extraordinary circumstances." RULE FOR COURTS–MARTIAL 913(c)(4), MANUAL FOR COURTS–MARTIAL, UNITED STATES (1998 ed.), Discussion. Counsel should be allowed to try the case without "unnecessary interference by the military judge." *Id.* In this case, there were no extraordinary circumstances to cause the military judge to interfere.

Despite her failure to object, Appellant now argues that SA Underwood's testimony that Leon Hayes told her he received the handguns from Appellant was inadmissible hearsay and not a prior consistent statement made prior to the motive to fabricate. Appellant's Brief of 27 Mar 2002 at 6–7. Appellant contends that Leon Hayes' motive to fabricate was triggered as soon as he was arrested, because he was trying to protect a mysterious and unknown "friend." *Id.* at 7.

"Hearsay" is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." MIL. R. EVID. 801(c). Hearsay is inadmissible unless it meets an exception under the rules. In order for a prior consistent statement to be admissible to rebut a charge of recent fabrication, improper influence, or motive to fabricate as an exception to the hearsay rule, the statement must be made before the motive to fabricate arises. MIL. R. EVID. 801(d)(1)(B); *see United States v. McCaskey,* 30 M.J. 188, 192–93 (C.M.A.1990). "Where multiple motives to fabricate or multiple improper influences are asserted, the statement need not precede all such motives or inferences, but only the one it is offered to rebut." *Allison,* 49 M.J. at 57.

While the Government at trial did not concede when, or even if, a particular motive arose, the prosecution offered the statement to rebut Appellant's contention at trial that Leon Hayes was lying to preserve his plea agreement with the United States. The parties signed Leon Hayes' plea agreement on 12 August 1999. Appellate Exhibit III at 12 (Hayes Plea Agreement of 12 Aug 1999). Leon Hayes' statement to SA Underwood occurred several days before his plea agree- ment existed and was offered to rebut the inference that he lied to protect his plea agreement. As Leon Hayes' statement to SA Underwood preceded the particular motive to fabricate raised by the defense, the statement was admissible as a prior consistent statement under Mil. R. Evid. 801(d)(1)(B).

Even assuming *arguendo* that Leon Hayes' statement to SA Underwood was made after a motive to fabricate existed, admission of the statement by the military judge did not constitute plain error. In light of trial defense counsel's failure to object to the admission of SA Underwood's testimony, we review admission of the evidence for plain error. *See United States v. Powell,* 49 M.J. 460, 464–65 (1998). Plain error "must not only be both obvious and substantial, it must also have 'had an unfair prejudicial impact on the jury's deliberation.'" *Id.* at 463 (quoting *United States v. Fisher,* 21 M.J. 327, 328 (C.M.A.1986)). Appellant has the burden of persuading this Court that there was plain error. *Id.* at 464. In light of our analysis above, any error was not obvious. Furthermore, after reviewing the record, we find any possible error was harmless and presented no fair risk of prejudice taking into consideration the overwhelming evidence presented at trial proving Appellant's guilt beyond a reasonable doubt. *See McCaskey,* 30 M.J. at 193. Under these circumstances, we conclude that the military judge did not abuse his discretion when he allowed the testimony of SA Underwood.

**B. Statement of Lamont Perry**

■ Lamont Perry was a civilian Government witness who testified on direct examination that Leon Hayes told him in the Spring/Summer timeframe of 1999 that he had received firearms (handguns) from Appellant. After a hearsay objection from trial defense counsel, this testimony was properly admitted as a non-hearsay admission "by a co-conspirator of a party during the course and in furtherance of the conspiracy." MIL. R. EVID. 801(d)(2)(E). On cross-examination, Lamont Perry testified that in July of 1999, while he was in jail, he contacted the FBI with information about stolen handguns.

Within a couple of days, Lamont Perry was released from jail and interviewed by NCIS SA Daniel D'Ambrosio. On cross-examination, trial defense counsel asked Lamont Perry no fewer than 11 questions about what he told SA D'Ambrosio during the interview. Particularly, trial defense counsel questioned Lamont Perry about what he told SA D'Ambrosio about the source of the weapons:

DC: Do you remember telling [SA] D'Ambrosio, when all this started, that it was an unknown individual who took the weapons from police storage?
WIT: No.

DC: You don't remember telling him that?
WIT: No.

 . . . .

DC: Now, when you talked with [SA] D'Ambrosio, you didn't tell him that Leon Hayes got the weapons from a black female who is his baby's mother's sister, did you? 4
WIT: No.

DC: In fact, you simply said that he received the weapons from a black female, who works at the police facility. Isn't that right?
WIT: No.

DC: You don't remember telling [him] that?
WIT: I said he received them from his baby's mother's sister.

DC: So, when you spoke with [SA] D'Ambrosio from the beginning, you gave him that detailed information?
WIT: Yes.

Record at 236–37.

In response to the attack on Lamont Perry's credibility, the Government called SA D'Ambrosio. SA D'Ambrosio testified that Lamont Perry told him he had information on the handguns that had been stolen from the armory. When asked who Lamont Perry said supplied the handguns, trial defense counsel objected on hearsay grounds. The objection was overruled and SA D'Ambrosio testified that Lamont Perry said Leon Hayes said "his baby's mother's sister," Appellant, provided the handguns. *Id.* at 289. This statement was not offered to prove the statement's truth—that Leon Hayes received the weapons from Appellant—but to rehabilitate Lamont Perry's credibility after it had been attacked on cross-examination by trial defense counsel. The statement was offered to prove that Lamont Perry made the statement to SA D'Ambrosio. As trial counsel

explained, the defense "specifically cross-examined Lamont Perry on what he told the agent. We're just trying to now clarify what exactly he did tell the agent." *Id.* Further, the military judge addressed Lamont Perry's statement when he issued his instructions to the members. *Id.* at 498–511.

Contrary to Appellant's argument, Lamont Perry's statement to SA D'Ambrosio was admissible "as evidence of the fact of the statement rather than as evidence of its content." *See McCaskey*, 30 M.J. at 193. "In such a case, a hearsay objection would not lie in any event; and so it is unnecessary for the proponent to wedge it into Mil. R. Evid. 801(d)." *Id.* Trial defense counsel did not request a limiting instruction regarding SA D'Ambrosio's testimony, and therefore forfeited any objection. R.C.M. 920(f).

Even if this Court were to find Lamont Perry's statement to SA D'Ambrosio was offered for its substantive value as a prior consistent statement under Mil. R. Evid. 801(d)(1)(B), Appellant has failed to demonstrate that Lamont Perry had a particular motive to fabricate who provided the handguns to Leon Hayes. The crux of Lamont Perry's information to law enforcement was that Leon Hayes had handguns for sale, not that Leon Hayes said he received handguns from Appellant. Under such circumstances, Lamont Perry's statement that Leon Hayes told him Appellant had supplied the firearms was also admissible as a prior consistent statement. MIL. R. EVID. 801(d)(1)(B).

We conclude that the military judge did not abuse his discretion by allowing testimony of the statements of Leon Hayes and Lamont Perry. Even if the military judge erred, Appellant's substantial rights were not materially prejudiced. *See* Art. 59(a), UCMJ. Contrary to Appellant's argument, the Government's case did not hang "entirely on the credibility of Leon Hayes and Lamont Perry." Appellant's Brief of 27 Mar 2002 at 8. In addition to the testimony of Leon Hayes and Lamont Perry, other evidence demonstrated that Appellant was the last person to inventory the weapons before they were reported missing. Prosecution Exhibit

4. *See supra*, note 2.

19. Furthermore, she was alone in the armory during her shift for a long enough period of time to steal the handguns. The shift prior to Appellant's shift reported a complete inventory. Prosecution Exhibit 23. The shift immediately following Appellant's shift found the weapons missing. We find that the Government's case did not hinge on the credibility of the statements of Leon Hayes and Lamont Perry and that the Government's evidence of Appellant's guilt was overwhelming. *See McCaskey,* 30 M.J. at 193 (holding that where the Government's evidence was overwhelming there was no fair risk of prejudice to the appellant). As such, we decline to grant relief.[5]

### Discovery Violation

■ In Appellant's second assignment of error, she asserts that, the military judge abused his discretion to the substantial prejudice of Appellant by failing to provide equal opportunity to obtain evidence by compulsory process in violation of R.C.M. 703(f)(1). The military judge denied Appellant's pretrial request for all statements made by Leon Hayes to his defense attorney during the course of Federal pretrial negotiations. Appellant avers that this Court should set aside the findings and sentence of the court-martial. We disagree.

"The attorney-client privilege … is designed to encourage full and unrestrained communication between client and attorney." *United States v. Fair,* 2 C.M.A. 521, 528, 10 C.M.R. 19, 26, 1953 WL 1767 (1953). "Any forced revelation of conversations resulting from the relationship is certain to discourage free and full disclosure of facts by the person seeking assistance of counsel." *Id.* "[A]ny forced admission of statements made under a belief of security from subsequent disclosure is certain to damage the sound policy which dictates enforcement of the attorney-client privilege." *Id.* While the prosecution, defense, and the court-martial have "equal opportunity to obtain witnesses and evidence," the Rules for Courts–Martial do not require

"disclosure or production of notes, memoranda, or similar working papers prepared by counsel and counsel's assistants and representatives." R.C.M. 701(f) and 703(a).

Even when a witness is given immunity from prosecution, this Court is highly suspect of efforts to pierce the veil of a witness' attorney-client privilege. As our superior Court stated in *Fair:* "We are not persuaded that immunity from prosecution removes the reason for enforcing the privilege. In our opinion, the injury that would inure to the attorney-client relation by the disclosure of the thought-to-be-privileged communication is greater than the benefit thereby gained for the correct disposal of litigation." *Fair,* 2 C.M.A. at 528, 10 C.M.R. at 19. Similarly, this Court found no automatic waiver when a witness testifies under a grant of immunity. *United States v. Brunious,* 49 C.M.R. 102, 104, 1974 WL 14015 (N.M.C.M.R.1974). "[A]n immunized witness does not waive his attorney-client privilege when giving testimony pursuant to a grant of immunity." *Id;* accord, MIL. R. EVID. 510(b).

While the witness at issue here, Leon Hayes, was not an immunized witness, the same rationale applies to a witness testifying pursuant to the terms of a plea agreement with the United States. Indeed, Appellant can offer no support whatsoever that a witness waives the attorney-client privilege simply by entering into a plea agreement with the *United States.* Leon Hayes, a Government witness, had a plea agreement with the United States Attorney of the Eastern District of Virginia. Appellate Exhibit III at 4–12 (Hayes Plea Agreement of 12 Aug 1999). That agreement required Leon Hayes to cooperate with the United States regarding any criminal activity of which he had knowledge. The agreement between Leon Hayes and the United States did not involve Appellant. Appellant has no standing to argue the parameters of the terms of that agreement. Nevertheless, Appellant argues that the agreement amounts to a waiver of the attor-

---

5. The military judge did not give a prior consistent statement instruction to the members. Record 498–511. Nor did trial counsel or trial defense counsel request that the military judge give a prior consistent statement instruction despite the record supporting such an instruction. *Id.* at

510. Nonetheless, despite the military judge erring by failing to *sua sponte* instruct on prior consistent statements, we find no prejudice to Appellant and that the error was harmless in light of the Government's overwhelming evidence to convict. *See McCaskey,* 30 M.J. at 193.

ney-client privilege. Appellant's Brief of 27 Mar 2002 at 11. The specific term at issue—paragraph 6, subparagraph c—states: "The defendant agrees to provide all documents, records, writings, or materials of any kind in the defendant's possession or under the defendant's care, custody, or control relating directly or indirectly to all areas of inquiry and investigation." Appellate Exhibit III at 7–8 (Hayes Plea Agreement of 12 Aug 1999).

Even assuming Appellant had standing to contest the terms of Leon Hayes' plea agreement, her interpretation of the agreement is inaccurate. As stated by Special Assistant United States Attorney Melissa Sternlicht, who prosecuted Leon Hayes and signed his plea agreement:

> At no time, has paragraph 6(c) or any other paragraph of the August 17[sic], 1999 plea agreement between [Leon] Hayes and the United States Attorney for the Eastern District of Virginia been interpreted or understood by any party to require [Leon] Hayes to provide to the government any notes or documents of any kind *that were prepared by his attorney in relation to his case.* Pursuant to his plea agreement or otherwise, this office has no intention of requiring [Leon] Hayes to waive his right to counsel under the Constitution of the United States or *his right to confidentiality within his attorney-client relationship with his defense counsel.* Therefore, to date, this office has not requested or received any notes or documents of any kind that are materials protected by the attorney-client privilege from either [Leon] Hayes or his defense counsel.

Appellate Exhibit III at 13–14 (Melissa Sternlicht Affidavit of 19 Oct 1999)(emphasis added). It is clear from Ms. Sternlicht's affidavit that the parties to Leon Hayes' plea agreement did not intend to include "all statements made by Leon Hayes to his attorney related to proffers or testimony or motives to plead guilty at his own trial." Appellant's Brief of 27 Mar 2002 at 9. On the contrary, rather than documents prepared by Leon Hayes' attorney, the agreement required production of pre-existing documenta-tion that had nothing to do with privileged communications between Leon Hayes and his attorney.

Appellant's second assignment of error relies on the rationale that "[t]o the extent [Leon] Hayes discussed his motives with his attorney, or told his attorney versions of the facts inconsistent with the one he told at the court-martial, such matters would have been critical to Appellant's case." Appellant's Brief of 27 Mar 2002 at 11. Even if the military judge erred when he denied Appellant's motion to compel production of privileged communications, when the only resulting prejudice is purely speculative in nature, such error does not rise to the level of a showing of real harm or legal prejudice necessary for material prejudice to a substantial right. Art. 59(a), UCMJ; *see United States v. Hudson,* 46 M.J. 226, 227 (1997). Furthermore, Appellant's right to evidence is not without limits. R.C.M. 703(f)(1). Appellant's speculation that the requested statements may have included information that supports his case is insufficient proof for requiring the military judge to compel production of those statements. *United States v. Rodriguez,* 57 M.J. 765, 773 (N.M.Ct.Crim. App.2002). Accordingly, we conclude the military judge did not abuse his discretion when he declined to grant relief.

It is also this Court's opinion that Leon Hayes' statements to his attorney are protected by the attorney-client privilege and not subject to compulsory process in Appellant's case. As such, we decline to grant relief.

### Conclusion

Accordingly, we affirm the findings and the sentence, as approved on review below.

Chief Judge OLIVER and Judge VILLEMEZ concur.