UNITED STATES, Appellee

v.

JOHNNY M. WEBB, Corporal, U. S. Air Force, Appellant

1 USCMA 219, 2 CMR 125

No. 370

Decided March 13, 1952

Col. Kenneth B. Chase, USAF, and Capt. Benton C. Tolley, USAF, for Appellant.

Col. Wendell C. Dreier, USAF, and Capt. William E. Shannon, USAF, for Appellee.

## Opinion of the Court

Paul W. Brosman, Judge:

The petitioner, Webb, was charged with the larceny of a Leica camera, in violation of Article of War 93, 10 USC § 1565. Following trial by general court-martial convened at MacDill Air Force Base, Florida, on May 29, 1951, he was found guilty and sentenced to be dishonorably discharged, to forfeit all pay and allowances, and to be confined at hard labor for one and one-half years. The findings and sentence were approved by the convening authority and thereafter considered by a board of review in the Office of The Judge Advocate General, United States Air Force. The board affirmed, one member dissenting, and the case is before us on timely petition for review granted February 20, 1952. On February 28, for good cause shown, we advanced the case on the calendar and it was heard the following day. Two assignments of error have been made by appellate defense counsel:

"A. The board of review erred in holding that the confession of the accused was voluntary when the evidence in the entire record conclusively shows that the confession was involuntary.

"B. The board of review also erred by not finding that fatal error was committed when the prosecution was permitted to cross-examine the accused in the presence of the court on matters pertaining to his guilt when the accused had taken the witness stand for the limited purpose of testifying as to the voluntary nature of the confession."

These assignments will be dealt with in the order mentioned. According to undisputed evidence the accused was interviewed twice during the morning of May 1, 1951, by Special Agent Walter Petersavage of the 7th District, Office of Special Investigations. The first of these meetings took place very briefly in the orderly room of the accused's organization, and in part, at least, in the presence of the Squadron Adjutant. Approximately one hour later a further interrogation took place in the quarters of the 7th District OSI at MacDill Air Force Base. During most of this second interview the accused and Agent Petersavage were alone, but they were joined at its end by the District Commander, 7th District OSI. Throughout the earlier short session the accused continued to deny guilt. During the second, however, he admitted the larceny and subsequently signed a full confession in the presence of Agent Petersavage and the District Commander. At some point during this interview Agent Petersavage made reference to two previous larceny cases within his experience. In one of these, he stated, the accused person confessed his guilt of the offense charged and received a relatively light sentence. In the other the accused did not do so, but on trial was found guilty and sentenced to a substantial period of confinement. Both the Special Agent and the accused agreed in substance as to the reference to the anecdotes. However, their testimony differed sharply as to when they were related by Petersavage and by inference, at least, as to the latter's apparent purpose in recounting them. According to the testimony of the accused, he was told of the two cases early in the second interview, before he had admitted guilt, and as part of an argument by the Special Agent to the effect that "things would go much easier" for him if he would confess. On the other hand, Petersavage's account places the stories relatively late in the interrogation, after a full oral confession had been made by the accused, and in response to an inquiry from the accused as to "what he would get out of it." Agent Petersavage denied that he had assured the accused that "things would go much easier" for him if he confessed, but on the contrary, stated

that he had informed him that "there was nothing I could do for him."

Although no issue was made of the matter by appellate defense counsel, the accused also testified that at no time was he warned of his rights under Article of War 24, 10 USC § 1495, by Agent Petersavage, and that in fact he was entirely unaware of these rights. On the other hand, Petersavage's testimony is explicit that the accused received such warning at the opening of the orderly room interrogation. At this time, the Agent testified, the accused literally halted the oral warning initiated by the former and stated that "he was not only familiar with [Article of War 24]; he knew it by heart." Petersavage was fully supported in this account by the testimony of the Squadron Adjutant, who was present when the original session began. In addition, the Agent testified that, despite the accused's protestations of familiarity, the provisions of the Article were read to him in toto "prior to his making the statement," and again "just prior to his signing the statement." Although the record contains no express corroboration of the first reading—for the two men were alone at the time—the testimony as to the second was verified in detail by the OSI District Commander, who was present when the confession was signed and who witnessed the accused's signature.

It is elementary law that a confession or admission may not be received in evidence if it was not voluntarily made. It is also a recognized principle of military practice that a confession is not admissible in evidence before a court-martial unless it is affirmatively shown that it is voluntary. See Article of War 24 supra; Manual for Courts-Martial, U. S. Air Force, 1949, paragraph 127a; Uniform Code of Military Justice, Article 31, 50 USC § 602; Manual for Courts-Martial, United States, 1951, paragraph 140a. However, the ruling of the law member, under the older practice, or of the law officer, under the new, that an offered confession is admissible in evidence is not conclusive of its voluntary character. This principle is expressed in the following language in paragraph 127a of the 1949 Manual, the provisions of which were applicable to the trial of the instant case:

"The ruling of the law member . . . that a particular confession or admission may be received in evidence is not conclusive of the voluntary nature of the confession or admission. Such a ruling merely places the confession or admission before the court. The ruling is final only on the question of admissibility. Each member of the court, in his deliberation upon the findings of guilt or innocence, may come to his own conclusion as to the voluntary nature of the confession or admission and accept or reject it accordingly. He may also consider any evidence adduced as to the voluntary or involuntary nature of the confession or admission as affecting the weight to be given thereto."

However, neither the 1949 Manual nor its 1951 successor seeks to furnish a specific test for the determination of voluntariness. In fact, the language of both sources is identical and indicates that "no hard and fast rules for determining when a confession or admission was voluntary are here prescribed." (See p 158, MCM, 1949). There is no branch of the law of evidence, says Dean Wigmore, in such inextricable confusion as that relative to confessions. See Wigmore, Evidence, 3d ed, 1940, paragraph 831. This confusion, he continues, is due in large part to the competition of the different tests for inducement and the judicial fluctuations between them. This Court's initial confession problem arose in the case of United States v. Monge, (No. 9), 1 USCMA 95, 2 CMR 1. Because of its novelty here we examined the basic law of the subject in some detail at that time—and we incorporate herein the views expressed there in so far as they are applicable to the case at bar and the theory on which it has been presented to us. In most state cases, and in a number of federal decisions as well, the rule excluding involuntary confessions is predicated on the proposition that, where the confession is the product of inducements reasonably engendering either hope or fear, the accused is de-

**221**

prived of his freedom of will, and the inference that an innocent man will not convict himself is rebutted. Thus the resulting confession is deemed untrustworthy as evidence. See Wigmore, Evidence, supra, paragraph 822. Basically, under this approach, the question is whether the accused fairly possessed, at the time of the confession, "mental freedom" to confess or to deny participation in the crime charged. See Lyons v. Oklahoma, 322 US 596, 88 L ed 1481, 1484, 64 S Ct 1208.

We need not concern ourselves here with danger of threats or fear, but rather only with the possibility of hope or promises—since the assertion of the accused is that his confession was obtained solely through prospects of leniency created through statements of the interrogating Special Agent. In fact, the petitioner, Webb, explicitly stated as a witness that no force whatever was used or threatened in this connection. The issue of voluntariness, as presented to trial courts in cases of this nature, is usually one of fact—and the present instance constitutes no exception. To fulfill our appellate responsibility, it is certainly incumbent on us to review the circumstances surrounding the making of the allegedly involuntary statement. However, where there is ■ conflict in the evidence as to whether imputed improper acts actually occurred, or where conceded facts reasonably permit varying inferences, the law member or law officer—that is, the "judge" of the court-martial—is not only better equipped for the purpose, but labors under a legal duty to weigh the evidence and to determine whether the confession is, in fact, admissible. Indeed, we must accept his resolution of the question of admissibility when it is supported by substantial evidence, regardless of whether we as individual lawyers might resolve the controverted question otherwise or draw other inferences from the facts. If the tribunal's judicial officer could conclude within the operation of a reasonable mind that the confession was voluntarily made, then we must affirm. See United States v. Monge, supra.

It would require a far stronger showing than we are able to discern in the present record to upset the ■ factual determination made below or to result in a finding of error on the part of the board of review. Beyond this holding it is not necessary—nor in the nature of things even possible—for this Court to go. It may be said, however, that with the accused's statement properly before it, we entertain no doubt of the sufficiency of the evidence to sustain findings of guilty. Uncontroverted testimony at the trial clearly established the surreptitious removal of the Leica camera from the automobile of its owner and the fact that it was pawned the following day by the accused, who was fully identified by the pawnbroker.

Reference was made by appellate defense counsel to the fact that, following the report of theft of the subject matter of the present charge, the Adjutant of the petitioner's squadron had indicated that he would attempt to "see that they threw the book at" the guilty person. In the interest of completeness we pause to consider the bearing of this portion of the Adjutant's testimony on the matter under consideration. We believe it has no measurable relevance. In the first place it does not appear when or where the exclamation was made, although that substantially similar words were spoken is conceded. Moreover, it was not shown that the language was directed to Webb, was used in his presence, or even that he was aware of such an attitude on the part of the indignant officer. Finally the entire position of the defense as to the confession is that it was induced not by threats or menaces, but solely by hope of leniency.

We now approach the second assignment of error—the claim that the government was permitted to inquire into the question of guilt in cross-examining the accused following his limited-purpose testimony concerning involuntariness of the confession. Under present procedure, as well as under that of the 1949 Manual, by which the present trial was administered, "an accused has the right to testify concerning the involuntary nature of his confession . . . without subjecting himself to cross-examination upon other issues in the

case, or upon the truth or falsity" thereof. Manual for Courts-Martial, U. S. Air Force, 1949, paragraph 127a; see Manual for Courts-Martial, United States, 1951, paragraph 140a. This provision exists for the manifest purpose of enabling the judicial officer of the tribunal to determine the preliminary question of admissibility, and ultimately to permit members of the court-martial to reach conclusions as to volition and weight.

A general cross-examination of an accused person under these circumstances, without mitigating factors ▆▆▆▆▆ ▆ of compelling character, would indeed require serious consideration and doubtless remedial steps on the part of this Court. It is certain that a forceful and persuasive invocation of the harmless error rule by the government would be required to prevent such action. However, a careful scrutiny of the record indicates that no such improper cross-examination took place. When the accused assumed the stand on the question of voluntariness he received explicit and careful warning and was fully advised of his rights. The law member scrupulously discharged his duties in this respect, as well as in all rulings made during the course of cross-examination. During both direct and cross-examination the accused testified variously that he had denied guilt, or that he had not admitted guilt, prior to the proposal of the alleged inducement by Agent Petersavage. It will be recalled that it was the position of the government that no reference to other illustrative instances involving a relationship between confession and sentence was made by the Agent until after Webb had fully confessed. This was the very crux of the case for the prosecution on this point. The position of the defense, on the other hand, was that these anecdotes were recounted prior to confession and for the purpose of suggesting the probability of milder punishment in return for an admission of guilt. In view of this situation it is difficult to see how the accused could expect to avoid full inquiry into whether and when he admitted guilt of the offense charged.

When an accused takes the stand in a criminal case he is entitled to no more protection than an ordinary witness, and in some respects to less. Certainly he should be prepared for elaborate and searching cross-examination—not, of course, exceeding the scope of direct. The very purpose of the legal device of cross-examination is to develop the truth—to probe out inconsistencies, contradictions, and falsehood. Given the nature of the task confronting him, we cannot find error in the trial judge advocate's conduct. We do not, in fact, believe that he should have done less than he did. As we read the record, the cross-examination in this case did not exceed the scope of the preceding direct. At no time did the prosecution attempt to inquire whether the accused did in fact commit the offense charged. Every aspect of the cross-examination interrogation was directed to whether and when he admitted guilt to Petersavage. These are vastly different questions. The first would have been improper. The second was not only proper but essential to effective cross-examination testing in the setting of this case.

The record indicates that the petitioner was well represented at the trial, and he had the assistance of able and vigorous appellate defense counsel before this Court. His rights have been fully protected. The errors urged in his behalf are not borne out by the record, and the issues must be resolved against his contentions. The decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.