UNITED STATES, Appellant

v.

ROBERT D. PHILLIPS, Private–1, U. S. Army, Appellee

2 USCMA 534, 10 CMR 32

No. 1376

Decided May 20, 1953

LT COL Thayer Chapman, U. S. Army, and 1ST LT Joseph C. Chandler, U. S. Army, for Appellant.

LT COL Edgar R. Minnich, U. S. Army, and 1ST LT Levin H. Campbell, III, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused was convicted by general court-martial in Germany of aggravated assault with a knife, in violation of Article 128 of the Uniform Code of Military Justice, 50 USC § 722. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for one year. The convening authority approved but the board of review reversed on the ground that the accused's privilege against self incrimination was violated at the trial. The Judge Advocate General of the Army has certified to us the correctness of the board of review's decision.

The record of trial indicates that the knife allegedly used in the assault was received in evidence over defense counsel's objection that the chain of custody had not been adequately established. Since trial counsel requested that the knife itself be withdrawn at the conclusion of the trial, a description of the knife was dictated into the record. Upon completion, the following colloquy ensued:

"LAW OFFICER: Phillips, is that satisfactory to you? Does that describe *your* knife all right?

"ACCUSED: Yes, sir.

"LAW OFFICER: Any objection by the defense counsel?

"DEFENSE: No objection.

"LAW OFFICER: It will be entered into the record and at the end of the trial the knife will be withdrawn." [Emphasis supplied].

The board of review held that the question by the law officer, which required the accused to state whether the knife in question was his, violated the accused's privilege against self incrimination as set forth in Article 31(a) of the Uniform Code of Military Justice, 50 USC § 602, and required reversal. We agree with the board of review that the information sought and obtained from the accused was both material and incriminating. In view of the fact that defense counsel objected to the admission of the knife in evidence on the ground that the chain of custody was not sufficiently established, it is difficult to understand why he did not object to the law officer's question, since it established the very point that defense was contesting.

The Government contends that our decision in United States v. Edward J. Collier (No. 467), 5 CMR 3, decided August 12, 1952, is determinative here. In Collier, a desertion case, the Government offered in evidence a stipulation stating that agents of the FBI would testify that the accused was apprehended at his home while wearing a

**535**

Class A uniform. The law officer asked the accused if he agreed that "the matters and things contained in the stipulation being introduced in court are true?" The accused replied that he did. We noted that the law officer was apparently interrogating the accused to determine his understanding of the nature and extent of the stipulation as required by paragraph 154b of the Manual for Courts-Martial, United States, 1951; that defense interposed no objection; that the stipulation included facts beneficial to the accused; that the accused was not placed under oath; that he was not told he had to answer; and that the accused later testified in his own behalf. We concluded that the record did not indicate that the accused was compelled to testify against himself.

There are several important distinguishing factors between Collier and the instant case. Here, the law officer had no right to question the accused concerning the description of the knife. His questions should have been directed to defense counsel. The subject matter contained nothing in any way beneficial to the accused. It cannot be ccntended here—as it was in Collier—that the accused might have gained, not lost, from the improper question and answer. The accused was required here to admit a link in the chain of evidence which his counsel had just been contesting. He did not subsequently take the stand to testify in his own behalf, and contested, throughout the trial, every element of the offense charged.

It is important to note that the protection granted by Article 31 of the Code, supra, goes further than a literal prevention of compulsory self incrimination. The accused is protected by the Article in question from being required to testify in any manner. He has the right to remain completely silent and, according to the Manual for Courts-Martial, United States, 1951, paragraph 53h, "the right to remain silent or to testify as a witness . . . will, when applicable, be explained in open court unless it otherwise affirmatively appears of record that the ac-

536

cused is aware of his rights in the premises." In Collier, supra, there was no occasion to inform the accused of his right to remain silent, since the law officer is not only advised but required to ascertain the acquiescence of the accused himself in a stipulation. Manual, supra, paragraph 154b; Appendix 8a, page 510. Here, the law officer had no right whatsoever to ask the accused for his views concerning the description dictated into the record.

As phrased, the law officer's question sought to elicit not information irrelevant to the issue, but affirmance of a vital link in the prosecution's case. He did not warn the accused of his right to remain silent, and there is no record showing that the accused was "aware of his rights in the premises." Manual, paragraph 53h, supra.

Placing these distinguishing factors against the background—common to both Collier and the instant case—that this was a military trial where the accused, an enlisted man, was being questioned by his superior officer, who was acting in the official capacity of a "judge," we cannot say that there was here no compulsion leading to incrimination. Both of the cases present factual situations difficult of resolution. The most we can say is that in Collier there were sufficient factors to tip the scales in a close case in favor of the Government; whereas here, those factors are lacking, and we must, in view of the importance of the privilege under discussion, resolve the doubts in favor of the accused.

The decision of the board of review is affirmed.

BROSMAN, Judge (concurring in the result):

I concur warmly in the result reached by the Chief Judge in this case. Of course, this agreement follows from the expression of views set out in my memorandum of concurrence in result in United States v. Edward J. Collier, decided August 12, 1952. The result reached by him in the instant case appears to support my position in Collier.

LATIMER, Judge (dissenting):

I dissent.

Here again is an instance in which a hypercritical technicality has been used as the basis for reversing a conviction supported by compelling evidence of guilt. The only insignificant speck which mars the record is an improper selection by a law officer of one single word. It is magnified on appeal out of all proportion to its effect in the trial forum to support a holding that the accused was required to testify against himself. For reasons which I later hope to make clear, I mention that no notice was taken of the inapt use of the word during the trial of the case but someone with a magnifying glass and a fine-tooth comb, when searching the record on appeal for a possible ground for reversal, ferreted out the hidden error. Perhaps the best way to show what an inoffensive part in the whole drama was played by this word, is to set forth the sequence of events.

At the outset of the trial, defense counsel made a motion that the charge against the accused be dismissed on the ground it did not allege an offense. He grounded his contention on the argument that merely stating in a specification that accused pointed a knife at another and said "I'm going to kill you" is not alleging sufficient facts to state an offense. He contended there must be some overt act set forth. It is noteworthy that throughout the trial this theory was developed and stressed and at all times defense counsel was insisting that an assault was not actually committed, not because the accused did not have a knife, but because he made no attempt to use it. It is readily understandable why this defense was used as there were four credible witnesses who testified that accused had a knife in his hand at the time of the alleged assault and there was no contention nor evidence to the contrary.

As to the foundation for admitting the knife in evidence, the prosecution established that a Sergeant Johnson took a knife away from the accused at the time of the incident and turned it over to a Captain Stilwell. Johnson identified the knife shown to him by the prosecution as the knife he obtained from the accused and fortified his identification by mentioning certain characteristics which were peculiar to the particular knife. Captain Stilwell was called as a witness and testified that at or about the time of the incident, Sergeant Johnson gave him a knife and that he recognized the particular knife as being the one given to him; that he had retained it in his possession from that time until one hour before trial when it was turned over to the prosecution for use in the case. With this foundation laid there could be no question about the admissibility of the knife. This evidence was all unquestioned and uncontradicted at the trial but in spite of that, when the exhibit was offered in evidence, defending counsel made a pro forma objection to its admission on the grounds that the chain of custody had not been completed—I suppose on the theory that the possessor of the knife during the one hour period prior to trial was not identified. The objection was overruled and rightly so.

As is done in practically every case involving an exhibit which might be of some value to an owner, the prosecution suggested that the knife be withdrawn at the conclusion of trial, and for appellate purposes, a description be substituted. The record best reflects how the incident arose and so I reproduce it.

"PROSECUTION: It is requested that at the end of the trial Prosecution Exhibit Number 2 be withdrawn and a written description be substituted in the record therefor.

"LAW OFFICER: Any objection?

"DEFENSE: No, sir.

"LAW OFFICER: Approved by the court. Why not dictate the description right now so that you won't have to worry about it and so that the defense counsel can approve it. Describe it in the record right now.

 . . . . . .

"PRESIDENT: The court will recess for 5 minutes.

 . . . . . .

"PROSECUTION: May the record reflect that all parties to the trial, including the accused, who were pres-

537

ent at the time of the recess are again present when the court reconvenes.

"With the permission of the law officer and the consent of the accused I will read into the record a description of Prosecution Exhibit 2. Prosecution Exhibit 2 is a pocket knife approximately 12 centimeters long with a 6½ centimeter blade, bone handle on one side with a handle on the other side missing, cork screw, punch, can opener and glass cutter a part of the knife.

"LAW OFFICER: Phillips, is that satisfactory to you? Does that describe your knife all right?

"ACCUSED: Yes, sir.

"LAW OFFICER: Any objection by the defense counsel?

"DEFENSE: No objection.

"LAW OFFICER: It will be entered into the record and at the end of the trial the knife will be withdrawn.

"PROSECUTION: The prosecution rests."

The trial continued on and all persons present must have been oblivious of the fact that the law officer had used a word improperly. Three lawyers were present in court and they failed to detect it. The reason is obvious. No member of the court mentioned it and perhaps for the same reason. This causes me to believe the entire incident went unnoticed until the case was on appeal when a detailed scrutiny of the record uncovered it. Had the law officer used the word "the" instead of "your," the colloquy could not have been challenged as inaccurate. In the over-all drama of the trial an obscure misuse of the word seems a petty and trifling inaccuracy.

I particularly call attention to the fact that there was no objection by defense counsel. He well represented the accused and had the incident had the slightest impact on the fairness and integrity of the trial, I am certain he would have sensed it. While I must draw on the record for certain of my conclusions, in doing so, I have tried to place myself as a participant in the trial for the purpose of avoiding a theoretical and academic approach to the problem. Knowing some of the difficulties encountered in trying a crim-

inal case, I cannot expect law officers to be infallible and I cannot expect them to use the English language with perfection. Inaccurate words and phrases creep in and if they go unnoticed by the lawyers, it is difficult to say they had an adverse impact on the court. Usually if some statement is made by a judge which might be considered as improperly influencing the course of a trial, or action is taken by him which denies an accused any right or privilege, someone takes an exception. If, however, the comment or act is innocuous or harmless, nothing is said or done. Apparently the question fell in the latter category.

Article 31 of the Uniform Code of Military Justice, 50 U.S.C. § 602, reads as follows:

"(a) No person subject to this code shall compel any person to incriminate himself or to answer any question the answer to which may tend to incriminate him."

The very essence of this provision is compulsion. Any voluntary statement does no violence to the Article. If by any stretch of the imagination there was compulsion here, it must flow out of the background of a trial and a question. Certainly everything that transpired prior to the question negatived compulsion. The trial counsel suggested the description be substituted after the trial was completed. He was not attempting to coerce the accused into testifying. The law officer suggested that it ought to be done at that time so the defense counsel could approve. Not the slightest intimation of compulsion in that. A recess was then taken by the court and apparently the parties agreed on the details as the trial counsel prefaced his description with a statement that he had permission of the law officer and the consent of the accused. The law officer had to determine if the latter part of that statement was true and if the accused was satisfied with the description as related. My associates say the law officer had no right to ask the accused if the description given by trial counsel was satisfactory to him and that the question sought to elicit information which was

irrelevant to the issue. I wonder if they really mean to establish that as the law. An accused has an interest in a complete record of proceedings being made available to appellate courts and I should believe he could be asked if he desired certain information related therein. Moreover, if a statement is made that an accused consents to a proceeding, it should be incumbent upon a law officer to make certain such is the case. To charge the law officer with impropriety evidences the difficulty encountered by the court in finding compulsion. Regardless of the way in which he may be taken to task, the fact remains that he was trying to protect the accused, not prejudice him. Aside from that, the accused and his counsel knew the purpose of the inquiry; they had been informed prior to the recess; they took no exception to trial counsel's statement that he was proceeding with the consent of the accused; the description was accurate and the questions asked were simple and understandable. Considered as a whole, the incident savors of assistance rather than compulsion. Wherein was the accused denied his right of free advice? It should be remembered he did not stand alone. His counsel was by his side, heard the statement by trial counsel and the question asked by the law officer. Counsel could have called the law officer's attention to the fact that he was requiring an incriminatory answer or he could have advised the accused he need not answer. If he were aware that any such interpretation could be placed on the question, he could have moved to strike the answer and a minor explanation by the law officer could have cleared the atmosphere. The actions and conduct of the parties participating in the trial show the aura of compulsion was just not present.

In United States v. Edward J. Collier (No. 467), 5 CMR 3, decided August 12, 1952, a similar question was presented. A futile effort is made to differentiate the two cases but the reasons are not persuasive. It would be better to bruskly overrule the case than to draw fine and illogical differences. In that case we stated:

"A reading of the record suggests that the law officer was not seeking to compel the accused to testify against himself. Rather, he was interrogating him to determine his understanding of the nature and extent of the stipulation as required by the foregoing section. The law officer, undoubtedly, used an ill-chosen phrase when he asked if the contents of the stipulation were true, but the words used must be interpreted in the light of existing conditions. The background before, and the facts and circumstances attending, the incident must be considered in determining whether the answers were exacted by compulsion or coercion.

. . . . . . .

"The essence of the privilege protected by the Code is freedom from giving compulsory testimony. Neither the letter nor the spirit of the Uniform Code of Military Justice is violated unless the accused is compelled or coerced into giving evidence incriminating himself. Compulsion may be either physical or mental, but to establish a violation of the right against self incrimination the accused must show some act which denies him the right to free choice. We have searched the record in vain for any such happening. . . ."

Those quotations are applicable here and they compel a finding contrary to the one announced in this case.

One further rule bears discussion, namely, failure on the part of the accused to claim his privilege. The law is that the right not to incriminate oneself is personal and must be claimed or it is waived. The record bears out that it was not claimed so this failure must be excused in some way if the majority concept is to be adopted. There is no reason that I see for excusing the accused except on the grounds that he did not consciously know he was answering an incriminatory question. I would concede that, because I have already expressed the opinion that no one in the courtroom knew he was. But there are good reasons why the accused should not be permitted now to claim he should be excused. One influential reason is that he seeks on

**539**

appeal to change his theory of defense. At the trial he stood squarely on the ground that he had a knife but by not using it he evidenced an intent not to commit an assault. Now he seeks to abandon that plan of attack and to contend he was forced to admit he had. a knife. To permit such shifting in tactics to result in reversal causes adroitness of counsel to replace substantial justice.

Particularizing more concerning accused's failure to claim a privilege, his defense was that he had a knife but did not attempt to make an assault with it. Cross-examination of Government witnesses was directed toward bringing out the fact that the accused could have used the knife at any time had he wanted to do so. One of the witnesses used by the prosecution stepped between the accused and the intended victim and his cross-examination was directed toward showing that he made only a token resistance and that the accused was not seriously threatening the victim. Another witness was cross-examined concerning the accused's lack of belligerency and the victim gave credence to the defense by stating in answer to a question by defense counsel that the accused stopped following him when the intervenor told him to do so. While it is difficult sometimes to tell the theory on which an accused rests his defense, in this case the arguments of his counsel point up clearly the theory upon which this accused sought his liberty. The following are statements taken from counsel's concluding argument:

"*. . . . If Private Phillips had wanted to use a knife* on Private Finley he certainly had ample opportunity there. . . . . *Why didn't Phillips go running over and stab Finley if he was going to kill him?* . . . Now, I submit, gentlemen, *if Phillips was really going to use that knife* to inflict some serious bodily harm on Finley, or to kill.him as the Government alleges, I say that it would have taken a hell of a struggle by Lusk to subdue him. . . . *Now that knife is not a throwing knife,* and to inflict harm with *that* knife a

man would have to advance up to his victim within cutting or striking range and use it in that fashion. . . . [Emphasis supplied].

The.posture of the record shows that the accused, whose only line of defense was based on a theory which would make his possession of a knife important to him, is unwittingly asked a question which infers ownership. If ownership is incriminating in this setting it certainly was not prejudicial. Everyone conceded the accused possessed a knife and its introduction into evidence was not required but its physical appearance may have been useful to both parties. The Government might use the exhibit to argue the means to carry a threat into execution were present while the accused might better make use of it in the manner he did, namely, that the participants were separated by some distance and the knife could not be used for throwing purposes. Moreover, the knife had been admitted into evidence and the sole question concerned its identification for use of appellate tribunals. This might, of course, likewise be beneficial to both parties. It was being removed as an exhibit in the case and in order to acquaint appellate tribunals, one with power to weigh facts, with its characteristics and capabilities, a description was read into the record. Accused could not be injured by this in view of his theory. No wonder when he was asked whether the description fairly depicted his knife, he readily answered yes. The wonder to me is that we give effect to his much belated claim of self incrimination.

While I believe a court-martial should render every accused the exact measure of his dues as granted by the Code, I think we must not overlook the fact that a court-martial is not a staged event which has been carefully written and preceded by dress rehearsals. The participants are human beings and being such, they often err in carrying out their assigned duties. Virtually every record shows some failure to reach the crest that is only demanded by perfectionists. When errors occur and they cause some measurable impact on the members of a court-martial adverse to an accused, justice demands that we

540

reversè the case. However, where as here, they concerned themselves with the minutiae of trial and in no way prejudice the substantial rights of an accused, we are bound by the Code to affirm.