UNITED STATES, Appellee

v.

FRANKLIN D. JACKSON, Private First Class,
U. S. Army, Appellant

3 USCMA 646, 14 CMR 64

No. 2691

Decided January 22, 1954

Lt Col James C. Hamilton, U. S. Army, and Capt William C. Irby, Jr., U. S. Army, for Appellant.

Lt Col William R. Ward, U. S. Army, Maj Irvin M. Kent, U. S. Army, and 1st Lt Bernard A. Feuerstein, U. S. Army, for Appellee.

## Opinion of the Court

George W. Latimer, Judge:

The accused was found guilty by a general court-martial of three offenses of larceny in violation of Article 121, Uniform Code of Military Justice, 50 USC § 715. He was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for five years. Intermediate reviewing authorities have approved. We granted the petition for review for the purpose of considering contentions that accused's pretrial statement · was inadmissible, that accused was compelled to incriminate himself at trial, and that the law officer during trial made a belittling remark concerning the importance of a defense theory.

The facts which gave rise to this prosecution are these: At about 1:00 am on July 18, 1952, Private James Gillett observed an unknown prowler enter the detachment barracks, take a pair of shoes and a pair of trousers belonging to Private Carl E. Hocher, Gillett's barracksmate, and then stealthily leave. Hocher and Gillett attempted to follow their uninvited visitor, but were unsuccessful in their attempt. The military police were notified, and within a few minutes accused was apprehended as he emerged from a nearby barracks. He was wearing Hocher's shoes at the time. While en route to the military police station in a military police vehicle, it was observed that accused appeared to be attempting to hide something behind his back. The vehicle was searched upon arrival at the station, and several wallets were found behind the seat upon which he was sitting. The wallets and their contents belonged to other soldiers billeted in the area. During the period in question, visitors to the detachment area were required to obtain permission from the charge of quarters to enter the barracks. The accused had not been given the required permission to go

648

into any of the barracks on the night in question.

Accused arrived at the military police station at about 1:30 am on July 18, 1952. He was given a copy of Article 31 of the Code, 50 USC § 602, appeared to read it, and thereafter stated that he understood its meaning. Despite this, to avoid any question about his knowledge of the Article, it was read aloud to him. Later that same morning, Article 31 was again read and explained to him. Thereafter accused was interrogated. At about 3:30 pm on that date, he asked to see a chaplain. This request was granted, and after a private consultation between the two, the accused wrote out a confession to the offenses charged. From the time of his apprehension until daylight accused was required to sit on a bench at the police station. While he was not prevented from sleeping on the bench, the fact is he did not. He was not informed he could do so and as a result he obtained no sleep at all on the night in question. More adequate accommodations were not available for the reason that the police station lacked confinement facilities. CID Agent Kettler, who interrogated the accused, did not know that he had not slept during the night, and did not inquire into that matter. At some time after his apprehension, the shoes which the accused was wearing were taken from him and he was required to remain barefooted. He was not mistreated physically, threatened with harm or promised any sort of reward to influence him to confess, but he was informed that his interrogators were prepared to spend the rest of the day at their task.

In previous opinions, we have announced the standards which we believe appropriate when determining, within the limits of appellate review, the voluntariness of a confession. In so doing, we have sought to base our holding on the facts of each case. But in each instance we have recognized twin touchstones which are operative in this field and germane to each inquiry. These were set out in United States v. Monge, 1 USCMA 95, 2 CMR 1, wherein we examined the law on the subject in some detail and observed that "Basically, the

question is whether the accused possessed, at the time of the confession, 'mental freedom' to confess or deny participation in the crime. . . . If the fact finders could reasonably conclude that the confession was voluntary, then we must affirm." In our review, we consider the circumstances surrounding the allegedly involuntary confession but we accept the determination of the triers of fact on the question of voluntariness whenever it is supported by substantial evidence and permissible inferences arising therefrom. United States v. Sapp, 1 USCMA 100, 2 CMR 6; United States v. Webb, 1 USCMA 219, 2 CMR 125; United States v. Colbert, 2 USCMA 3, 6 CMR 3; United States v. Fair and Boyce, 2 USCMA 521, 10 CMR 19.

On the facts as we view them, we can only find two possible deprivations and one affirmative act which might deny the accused his right of mental freedom. The former are deprivation of sleep and shoes; the latter, possible lengthy interrogation. However, we cannot say that collectively or individually they would, in fact, amount to coercion, particularly in the light of other considerations found in the record. The accused, testifying as a witness on the limited issue of involuntariness, showed considerable presence of mind and adequate intellect and the record indicates he had the capacity to understand clearly his right not to say anything. While he may have been uncomfortable sitting on a bench, he was not prevented from attempting to sleep and rest and there is no showing that this deprivation was imposed for reasons other than the lack of accommodations. He might have been embarrassed by the removal of his shoes, but there was evidence that the shoes were in fact owned by Private Hocher, one of the alleged victims. There is no reason why the shoes belonging to Hocher should not be taken from the accused, and the inference that they were taken for evidentiary purposes is reasonable, inasmuch as they were so used at trial. The showing made by accused on intensive and prolonged interrogation is unimpressive. While he

was in the station for some fourteen hours, the fair inference is that the interrogator was there for less than one-half that time, and there is no evidence that he was constantly plying accused with questions. Furthermore, accused was adamant in his refusal to discuss any facts or circumstances surrounding the crime until after he had conversed in private with the chaplain. Immediately thereafter he wrote out the confession in longhand and in his own words. During that time he was uninfluenced by anything save his own conscience. Faced realistically, we believe that the triers of the facts reasonably could conclude that his confession was induced solely by his consultation with the chaplain, which negatives the view that he was so coerced by other influences that he was prevented from exercising his choice to admit or deny the crime, or to refuse to answer.

The second question for consideration revolves around an assertion that the accused was compelled to incriminate himself at trial. This incident arose in the following manner. As related in the statement of facts, the evidence disclosed that Private Hocher's shoes were stolen and that shortly thereafter accused was apprehended while wearing these shoes. At trial, Hocher identified the pair, identified as Prosecution Exhibit No. 1, as the shoes which were allegedly stolen. Later, accused took the stand for the limited purpose of supporting his contention that the confession was involuntary. Among other things, he testified the shoes had been taken from him and he was forced to walk barefooted. Thereafter, upon examination by a member of the court-martial, the following exchange took place:

"Q. [by a court-martial member] Are the shoes that they took away from you those (indicating Prosecution Exhibit 1) in the . . .

"A. Yes, Sir.

"L. O.: I object to that question: It is highly improper and the court will disregard both the question and answer completely and they will be stricken from the record."

The defense counsel's contention with respect to the involuntariness of the confession was put forth with vigor and clarity. He sought to establish that the deprivation of sleep, the removal of the shoes, and the lengthy questioning of the accused were all part of a single pattern of coercion. He insisted that the pattern of coercion was designed to, and did in fact, elicit accused's confession. Therefore, any information which would strengthen or weaken the contention would be relevant.

It is patent that if the accused's shoes were forcibly removed from his body for the purpose of causing him embarrassment or physical torture, the contention of coercion might thereby be strengthened. In the absence of any other explanation, it might be inferred that the forcible removal of the shoes was intended to weaken the resistance to confession. However, if the truth of the matter was that the shoes belonged to Hocher, the inference does not follow, as other possible and legal reasons would be present to justify the military police in recapturing the stolen item. In the latter event, it would be reasonable to conclude that accused's shoes were not taken for the purpose of harassing him but for the purpose of preserving them as evidence or returning them to the owner. A decision on which of the two purposes is the more plausible is rendered much easier if it is established that the shoes taken from the accused were the shoes owned by Hocher. The court-martial member who asked the question inveighed against could have been seeking to establish that basic fact. While the answer given to the question asked might tend to strengthen the prosecution's case on the merits, it also tended to weaken the evidence given by the accused on the collateral issue. We, therefore, conclude that the question asked by the court-martial member was not improper, and our remarks here are consistent with our previous pronouncements concerning a similar type of question. In United States v. Hatchett, 2 USCMA 482, 9 CMR 112, we said:

"It is difficult to mark with precision the area of legitimate cross-ex-

amination when a witness is testifying generally, but it is more difficult when called for a limited purpose. Sometimes questions which have a legitimate tendency to test credibility bring out facts and circumstances which may raise questions concerning incrimination. Even though an accused testified for a limited purpose this does not preclude the cross-examiner from probing into fields which may weaken or destroy his evidence. It may be that in certain instances the answers might indirectly tend to connect the accused with the crime or to identify him as being a possible perpetrator of an offense, but if they are relevant to test his credibility, the questions are proper and must be answered. An accused voluntarily elects to take the witness stand and in so doing he is subject to being cross-examined on those matters which he testified about on direct examination and to other matters which affect his credibility as a witness."

Furthermore, we can, for the purposes of this case, assume that the question asked by the member ▮ was incompetent without finding that his conduct requires reversal. The transcript shows the accused answered before the question was completed and before the law officer could advise him not to answer. Defense counsel made no objection, but this could have been because the law officer, acting promptly and with finality, struck the question and the answer from the record. In addition, he informed the court-martial members in no uncertain terms that the question itself was improper and directed them to disregard the entire exchange. Presumptively, they followed this direction. United States v. Day, 2 USCMA 416, 9 CMR 46. It is true that the damaging effect of a particular type of evidence improperly received may not always be cured by a direction such as the one here given. But as we view the incident and its background, the exchange did not involve inflammatory, degrading, or disgracing evidence, and bad faith on the part of the member is not intimated. Under those circumstances, we are convinced that if any damage was occasioned by the question or answer, it was repaired by proper instruction. See United States v. O'Briski, 2 USCMA 361, 8 CMR 161.

The remaining contention which merits consideration is that the law officer improvidently and prejudicially belittled the defense's theory that the confession was the result of coercion. The operative facts are these: The prosecution, with a view to introducing accused's confession, sought to make the required preliminary showing that the confession was voluntary and that accused's interrogators had complied with Article 31 of the Code. On cross-examination, defense counsel sought to bring out that accused had been denied sleep and rest prior to the interrogation. As several witnesses for the prosecution took the stand, in turn, it became apparent on cross-examination that none of them knew whether or not the accused had slept on the night in question. Because the matter involved a preliminary question, counsel for defendant recalled a Government witness in an effort to support the accused's version. Counsel, however, assumed he was cross-examining the witness and used a leading form of question. Government counsel registered objections and the law officer sustained a number, but did not strike the answer. After defending counsel finished his cross-examination, the law officer asked if there were any further questions and trial counsel stated:

"I'd like the reporter to read the last answer of the witness back to me, please—rather the last answer to the question asked by defense counsel."

The law officer replied:

"I think in the interest of time— does the prosecution have any objection to just stipulating that the accused didn't have any sleep from the time he was picked up to the time he made the statement? Do you have any objection to that stipulation? We might cut out a lot of this gobbledygook."

The prosecution refused to so stipulate, and the trial proceeded. Defense counsel did not object at trial to the

word now alleged to be crucial. In deciding whether this comment was error and, if so, whether the accused was prejudiced, certain principles stand out. The law officer is not a mere figurehead in the courtroom drama. ▆▆▆▆ He must direct the trial along paths of recognized procedure in a manner reasonably calculated to bring an end to the hearing without prejudice to either party. Within the framework of that duty, we have accorded him the right to make restrained comments on the evidence and to avoid cluttering up the proceedings with unnecessary, immaterial, or repetitious questions or issues. However, law officers must be careful to maintain an impartial and ▆▆▆▆ scrupulously fair attitude throughout the trial, for their conduct perforce influences the tone of the entire proceeding. But fairness may sometimes include the necessity of ending useless arguments over issues, methods of proof, admissibility of evidence, and other matters arising during the course of a trial. A law officer must exercise control, and for that reason, when an accused asserts that he has been prejudiced by a ruling or by a comment of the law officer, we must determine the impact of the remark in the background of the attending circumstances and in the light of the entire record. Todorow v. United States, 173 F2d 439 (CA9th Cir) (1949), cert den 337 US 925, 93 L ed 1773, 69 S Ct 1169.

Tested by that rule, we cannot spell out error prejudicial to the accused. There is but one questioned ▆▆▆▆ comment and it was uttered in an effort to end haggling over leading questions and precedural difficulties. The one word used, which was perhaps unfortunate, is said to imply mere repetition. Flesch, The Art of Plain Talk, 2d ed (1946), pages 123–124. In the byplay, the remark was directed to trial counsel not defense counsel, and it sought to obtain a concession favorable to the accused. Lastly, defending counsel did not object to the remark. This is principally of importance to shed light on how the comment would be interpreted by those participating in the trial, and defense counsel was in the best position to determine whether the remark could have been considered as directed toward him and his defense. He must have been satisfied that it was intended to apply to trial counsel. Finally, at the conclusion of the trial and while giving his instructions, the law officer carefully cautioned the court to disregard any comments made by him during the course of the trial which would seem to indicate an opinion on the merits of the case. We have no reason to believe the court-martial did not follow that admonition.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

BROSMAN, Judge (concurring):

I concur fully in the principal opinion. I am sure that nothing said therein is inconsistent with the view expressed in my separate opinion in United States v. Collier, 1 USCMA 575, 5 CMR 3, nor with the action of this Court in United States v. Phillips, 2 USCMA 534, 10 CMR 32, both of which positions are clearly distinguishable from the sound one taken by Judge Latimer here.